# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| **DERRICK D. MOORE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO.: 1:10-CV-330** |
| | ) | |
| **PARK CENTER, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Derrick Moore brings this suit against his former employer, Park Center, Inc., asserting that it terminated him in retaliation and in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3, for reporting an incident of sexual harassment.[1]  Park Center has moved for summary judgment on all claims (Docket # 19), and the motion is now fully briefed. (Docket # 20, 22, 36-38.)

For the following reasons, Park Center's motion for summary judgment will be GRANTED.

---

[1] Subject matter jurisdiction arises under 28 U.S.C. § 1331.  Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.

Moore also advanced a gender discrimination claim in his complaint, but did not respond to Park Center's motion for summary judgment on the matter.  Of course, any issues raised in the summary judgment motion that are not responded to by the non-moving party are deemed abandoned. *See* Fed. R. Civ. P. 56(e)(2); *Palmer v. Marion Cnty.*, 327 F.3d 588, 597-98 (7th Cir. 2003) (collecting cases).  Accordingly, summary judgment will be GRANTED on Moore's gender discrimination claim, and it warrants no further mention.

# I. FACTUAL BACKGROUND[2]

Moore, a former special education teacher, began his employment with Park Center, a behavioral health organization in Fort Wayne, Indiana, in February 2008 as a Case Manager in a group home for females with substance abuse problems or mental illness.[3] (Moore Dep. 28, 42; Moore Aff. ¶¶ 3, 4.) This was Moore's second stint as a case manager, as he served in that position for another behavioral health organization from 2006 to 2008. (Moore Aff. ¶ 4.)

On January 12, 2009, Moore was promoted to Case Manager II in the adolescent day treatment area of the Family Education Center of Park Center. (Moore Dep. 49; Hartley Aff. ¶ 3; Wallace Aff. ¶ 4.) Moore was supervised by Linda Hartley, Manager of the Family Education Center, who was located at a different work site. (Moore Dep. 49, 113; Hartley Aff. ¶¶ 2-3.) In the adolescent day treatment area, Moore worked with a "treatment team" consisting of four females: Melinda Welling, another Case Manager II; Danielle Wardell, Psy.D., a psychologist; Tabitha Carlson, Psy.D., a post-doctoral practitioner; and Vanessa Jones-Premer, an intern. (Moore Dep. 59-60.) Moore shared an office with Welling, whom he claims repeatedly spoke to him about her personal sexual interests, preferences, and activity. (Moore Aff. ¶ 6.)

On January 23, 2009, Carlson, who had covered for Wardell the week before while she was on vacation, sent an e-mail to Wardell listing a number of concerns that she had about Moore. (Carlson Aff. ¶ 7, Ex. 1.) These included, among other things, that he was taking breaks,

---

[2] For summary judgment purposes, the facts are recited in the light most favorable to Moore, the nonmoving party. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Insofar as Moore does not controvert the facts asserted by Park Center in its "Statement of Material Facts," those facts "are admitted to exist without controversy" as set forth below. *See* N.D. Ind. R. 56.1.

[3] Moore received one disciplinary reprimand during the eleven months he worked at Park Center's group home for females. (Moore Dep. 43.)

eating full meals during school sessions, confronting students in a "lecture mode," watching television, and that his cell phone was ringing during group sessions. (Carlson Aff. ¶ 7, Ex. 1.)

On or about January 29, 2009, Moore conducted a group session at which Welling, Wardell, and four or five students were in attendance. (Moore Dep. 58.) Moore contends that, during the session, Welling reached for a notebook that Moore was holding on his lap, and, in doing so, touched and groped his penis. (Moore Dep. 58; Moore Aff. ¶ 5.) This caused Moore, in surprise and shock, to sit up straight in his chair. (Moore Dep. 58-59; Moore Aff. ¶ 5.) Welling then laughed and walked away. (Moore Dep. 59; Moore Aff. ¶ 5.) Moore states that because of their location in the room, no one else could see the incident. (Moore Dep. 58.)

After the session, Moore approached Welling and asked her whether she realized that she had touched him. (Moore Dep. 59.) According to Moore, Welling then answered "yes." (Moore Dep. 59.) Moore, who felt that the treatment team had "worked great together" before the incident, contends that after this exchange, he felt "the atmosphere of the office" changed, his team members started whispering about him and staring at him, and he was "shut out of the treatment team."[4] (Moore Dep. 59, 65, 92; Moore Aff. ¶ 7.)

About a week later, on February 6, 2009, Carlson sent another e-mail, this time to Hartley, expressing numerous concerns about Moore's interaction with clients and staff. (Hartley Aff. ¶ 4, Ex. 1; Carlson Aff. ¶ 8.) That same day, Wardell conveyed similar concerns about Moore's performance to Hartley. (Hartley Aff. ¶ 5, Ex. 2; Wardell Aff. ¶ 5, Ex. 1.) Their

---

[4] Welling, not surprisingly, describes this brief interaction in a different manner. Her version is detailed *infra* in connection with the investigation findings.

writings identified a lengthy list of performance deficiencies, including Moore's receiving calls, texting, and eating during group sessions with students; engaging in inappropriate confrontations and using a "lecture mode" with students; a lack of initiative and professionalism; tardiness; argumentative, defensive, and abrasive behavior; and that, due to the foregoing traits, at least two students had requested not to work with him. (Hartley Aff. Exs. 1, 2.)

After another week, on February 13, 2009, Moore called Marsha Wallace, Park Center's human resources manager, stating that he needed to discuss an allegation of sexual harassment with her. (Wallace Aff. ¶ 5.) They scheduled a meeting for February 17, 2009. (Wallace Aff. ¶ 5.) Moore, however, failed to appear for the meeting. (Wallace Aff. ¶ 5.) Two days later, on February 19, Moore called Wallace again, apologizing for missing the meeting and explaining that he had been ill. (Wallace Aff. ¶ 6.) They rescheduled the meeting for the next day, February 20 at 3:30 p.m.; Moore, however, again failed to appear for the meeting, and Wallace left for the day at 4:00 p.m. (Wallace Aff. ¶ 6.) The next workday, Moore left Wallace a voicemail, stating that he had been tied up at the Family Education Center until 4:30 p.m.[5] (Wallace Aff. ¶ 7.) Moore never contacted Wallace to schedule another meeting. (Wallace Aff. ¶ 8.)

At some point prior to February 23, 2009, Moore called Hartley to schedule a meeting with her to discuss certain "problems that [he was] having over at the office." (Moore Dep. 51.) He did not disclose to her that the "problems" involved sexual harassment allegations.[6] (Moore

___

[5] Nevertheless, Lucinda Raines, a Case Manager III at the Family Education Center, informed Wallace several days later that she told Moore at 3:25 p.m. on February 20, 2009, that he could leave for the day. (Wallace Aff. ¶ 7; Raines Aff. ¶¶ 4-6.)

[6] There is conflicting evidence from Moore concerning when he first informed Hartley about the "penis touching" incident. In at least two places in the record, he contends that he spoke with Hartley on February 13, 2009. (Moore Aff. ¶ 13(b); Wallace Aff. Ex. 1.) Otherwise, however, Moore's evidence represents that he did not report the incident to Hartley until the close of the February 23, 2009, meeting.

Dep. 51-52.) From Moore's perspective, however, he requested the meeting with Hartley so that he could make his "initial report of discrimination." (Moore Dep. 51, 68.)

On February 23, 2009, Moore met with Hartley, Wardell, and Jeff Stachera, the Clinical Coordinator for the Family Education Center.[7] (Moore Dep. 49-51; Hartley Aff. ¶ 6; Wardell Aff. ¶ 6: Stachera Aff. ¶ 4.) Moore did not speak during the forty-five minute meeting because he did not feel comfortable discussing the sexual harassment allegations in front of Stachera or Wardell, who was a close friend of Welling's. (Moore Dep. 51-52.) Instead, the meeting consisted of Hartley identifying Moore's various purported performance deficiencies—including, an unwillingness to work with others and an abrasive attitude—and how he needed to improve. (Moore Dep. 51; Hartley Aff. ¶ 7; Wardell Aff. ¶ 6; Stachera Aff. ¶ 5.)

At the close of the meeting, Moore approached Hartley and reported the January 29, 2009, incident—that is, that Welling had touched his penis when she reached for a notebook that he was holding in his lap during a meeting. (Hartley Aff. ¶ 8; Moore Dep. 58; Moore Aff. ¶ 8.) Hartley questioned Moore about whether he was sure he wanted to report it, suggesting that it could further hinder his "chemistry with the team."[8] (Moore Aff. ¶ 13(e).) Nevertheless, Hartley called Wallace in human resources that same day and reported the allegations. (Hartley Aff. ¶¶ 9-10; Wallace Aff. ¶ 9.)

---

[7] Hartley, Wardell, and Stachera contend that Hartley, rather than Moore, called the February 23rd meeting to discuss Moore's performance issues. (Harley Aff. ¶ 6, Ex. B; Wardell Aff. ¶ 6; Stachera Aff. ¶ 4.)

[8] Hartley recalls this exchange a bit differently. She represents that just prior to relaying the allegations to her, Moore said: "I haven't told anyone this and I don't want you to tell anyone." (Hartley Aff. ¶ 8.) After hearing the allegations, Hartley represents that she told Moore that she had to call human resources to report the incident. (Hartley Aff. ¶ 9.) Moore then told her he did not want to "make a mess of things," but she informed him she still had to call human resources to report the allegations. (Hartley Aff. ¶ 9.)

Later that same day, Moore sent an e-mail to Wallace in human resources detailing his allegations against Welling. (Wallace Aff. ¶ 10; Moore Aff. ¶ 8.) Wallace responded to Moore that she would investigate the matter, and she immediately did so. (Wallace Aff. ¶¶ 10, 11.) Wallace and Stachera jointly conducted separate interviews with each of the "treatment team" members other than Moore—that is, Wardell, Carlson, Welling, and Jones-Premer—and Daniel Raber, a security officer who provided security for the adolescent day treatment program. (Wallace Aff. ¶¶ 12, 13; Stachera Aff. ¶ 7.)

During her interview, Welling represented that although she and Moore did share an office and talked about their lives, including divorce and interracial relationships, she never "made a pass at" or was aggressive toward him. (Welling Aff. ¶ 4; Wallace Aff. ¶¶ 12, 13, Ex. 2.) Welling admitted that she reached for a binder on Moore's lap during the January 29th meeting, but was unaware that she had touched his penis. (Welling Aff. ¶ 5.) She recalled that, after reaching for the binder, she immediately realized that she had invaded Moore's personal space and therefore apologized to him; she represented that she apologized again when Moore later asked her about the incident. (Welling Aff. ¶¶ 5, 6.) Welling stated that she did not discuss the incident with anyone else and, until questioned by Wallace, considered it a "non-issue." (Welling Aff. ¶ 7.)

As to the other interviewees, Carlson vaguely recalled Welling reaching for a binder from Moore, taking it off his lap, and then her stating that she did not mean to invade his personal space. (Carlson Aff. ¶ 5.) Wardell did not specifically recall the January 29th meeting, but she listed Moore's various performance problems during her interview with Wallace. (Wardell ¶¶ 7, 8.) Raber reported that he overheard many conversations between Moore and Welling, but the

only personal discussions he overheard were about divorce, as both Moore and Welling were divorced individuals. (Raber Aff. ¶ 4.) Jones-Premer never noticed anything inappropriate between Moore and Welling, but did report that Moore complained about other team members, was very argumentative, and accused other staff members of being aggressive or inappropriate. (Jones-Premer Aff. ¶¶ 4-6.)

Wallace and Stachera concluded that the investigation did not substantiate Moore's allegations of sexual harassment, but did reveal, however, that he had performance problems, including tardiness, an unwillingness to listen and accept direction, and being critical of other team members. (Wallace Aff. ¶ 14; Stachera Aff. ¶ 8.) Wallace communicated this finding to Moore in writing on March 2, 2009. (Wallace Aff. ¶ 15, Ex. 3.) The next day, Moore stated in an e-mail to Wallace that he was not satisfied with Park Center's investigation and response and asked if there was anyone else he could speak with about the matter. (Wallace Aff. ¶¶ 15, 16, Ex. 3; Moore Aff. ¶ 10.) Wallace responded to Moore by reiterating the investigation's findings and copying her supervisor, Brad Altevogt, the Vice President of Administrative Services at Park Center. (Wallace Aff. ¶ 16, Ex. 4.)

Moore e-mailed Wallace a second time that same day, again challenging the thoroughness of the investigation—in particular, the fact that he was never interviewed—and suggesting that perhaps he had "rubbed [her] the wrong way by missing the meeting with [her]." (Wallace Aff. ¶ 17, Ex. 5; Moore Dep. 88, 90.) Wallace informed Moore that Altevogt had reviewed the investigation process and the outcome and concurred in its conclusion. (Wallace Aff. ¶ 17.) To avoid even the perception of a conflict, however, Park Center moved Welling out of the office she shared with Moore. (Wallace Aff. ¶ 18.) Moore remained in the office.

(Wallace Aff. ¶ 18; Moore Dep. 92.)

Also during the week of March 2, 2009, Wardell told Hartley that she had learned that Moore was logging notes for clients before the sessions were ever completed, which Hartley considered a form of fraud. (Wardell Aff. ¶ 11; Hartley Aff. ¶¶ 11, 13.)  When confronted, Moore told Hartley that Welling had trained him to enter the notes in that manner (Moore Dep. 124); Welling, however, denied this (Hartley Aff. ¶ 12).  Hartley then checked the computer-recorded date and time of Welling's notes and confirmed that she had never documented notes before the completion of a group session. (Hartley Aff. ¶ 12.)  Consequently, on March 6, 2009, Hartley issued Moore a written warning for falsifying notes; Moore signed the warning, admitting that he had made a mistake. (Hartley Aff. ¶ 13; Moore Dep. 124, Ex. P.)

That same week, Hartley also learned that Moore had called the Allen County, Indiana, probation department on February 13, 2009, to speak about a client, L.S., who had been enrolled at Park Center by his mother and assigned to Moore. (P.S. Aff. ¶ 2; Hartley Aff. ¶ 14.)  L.S.'s mother was very upset that Moore had contacted the probation department, as Moore himself had placed a note in L.S.'s file dated January 26, 2009, indicating that L.S.'s mother had specifically stated that no one was authorized to speak to the probation department about her son.[9] (Hartley Aff. ¶ 15; Moore Dep. 114, Ex. O.)  Hartley believed that Moore's actions violated Park Center's HIPAA and confidentiality policies. (Hartley Aff. ¶ 19.)

On March 6, 2009—the same day that she issued Moore the written warning for falsifying notes—Hartley recommended to Wallace that Moore be terminated based on his deficient performance, the latest (and perhaps most serious) example of which was his

---

[9] L.S.'s mother ultimately removed L.S. from Park Center. (Hartley Aff. ¶ 17.)

unauthorized contact with the probation department in violation of Park Center's HIPAA and confidentiality policies.[10] (Hartley Aff. ¶ 19.)  Wallace and Altevogt agreed with the decision. (Wallace Aff. ¶ 19.)  Consequently, Hartley terminated Moore on or about March 11, 2009, and handed him a Notice of Termination, which he refused to sign, detailing the reasons for his termination, including a lack of judgment and professionalism, unwillingness to follow direction, a disregard for therapeutic techniques, rudeness and insubordination, completing documentation before client services were completed, and violating HIPAA. (Hartley Aff. ¶ 20, Ex. 4; Moore Dep.108, Ex. N.)

## II.  STANDARD OF REVIEW

Summary judgment may be granted only if there are no disputed genuine issues of material fact. *Payne*, 337 F.3d at 770.  When ruling on a motion for summary judgment, a court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Id.*  The only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 604 F.3d 490, 507 (7th Cir. 2010) (quoting *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994)). If the evidence is such that a reasonable factfinder could return a verdict in favor of the

---

[10] Apparently, Hartley did not discuss with Moore his purportedly unauthorized contact with the probation department before she recommended his termination.  Moore now contends that although L.S.'s mother did initially state that she did not want anyone to contact the probation department, she later changed her mind and agreed that he could provide "good information" about L.S. to probation. (Moore Dep. 116, 121; Moore Aff. ¶¶ 18, 19.)  Moore states that L.S.'s mother then signed a release, and he placed it in L.S.'s file. (Moore Dep. 116, 121; Moore Aff. ¶¶ 13(c), 19.)  The purported signed release, however, does not appear in L.S.'s file (Moore Aff. ¶ 13(c)), and L.S.'s mother has no recollection of Moore asking her to sign a release of information giving him, or for that matter, anyone at Park Center, permission to contact L.S.'s probation officer. (P.S. Aff. ¶ 3.)  To the contrary, L.S.'s mother specifically recalls informing Moore that it was not necessary for him to talk with L.S.'s probation officer. (P.S. Aff. ¶ 3.)

nonmoving party, summary judgment may not be granted. *Payne*, 337 F.3d at 770. A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true," as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.* However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771.

### III. DISCUSSION

#### *A. Applicable Law*

A plaintiff alleging retaliation under Title VII can contest summary judgment by using either the direct or indirect method of proof. *Benuzzi v. Bd. of Educ. of City of Chicago*, 647 F.3d 652, 664 (7th Cir. 2011). "To avoid summary judgment on a retaliation claim under the direct method, a plaintiff must produce evidence from which a jury could conclude: '(1) that [he] engaged in a statutorily protected activity; (2) that [he] suffered a materially adverse action by [his] employer; and (3) there was a causal link between the two.'"[11] *Id.* (quoting *Silverman v. Bd. of Educ. of City of Chicago*, 637 F.3d 729, 740 (7th Cir. 2011)); *see also Davis*, 651 F.3d at 674.

"To establish a prima facie case of retaliation under the indirect method, [a plaintiff] must

---

[11] "Direct evidence is evidence that, if believed by the trier of fact, would prove discriminatory conduct on the part of the employer without reliance on inference or presumption." *Serednyj v. Beverly Healthcare, LLC*, 656 F.3d 540, 548 (7th Cir. 2011) (citation omitted). "This type of evidence requires an admission by the decision-maker that her actions were based upon the prohibited animus." *Id.* (citation and internal quotation marks omitted). "A plaintiff may also establish [his] direct case by presenting a convincing mosaic of circumstantial evidence from which a reasonable juror could infer intentional discrimination by the decisionmaker." *Id.* That is, "circumstantial evidence must point directly to a discriminatory reason for the employer's action." *Id.* (citation and internal quotation marks omitted); *see Davis v. Time Warner Cable of Se. Wis., L.P.*, 651 F.3d 664, 672 (7th Cir. 2011) ("Whether deemed a chain or mosaic, the assembled evidence must point directly to a discriminatory reason for the employer's action for [the plaintiff's] claim to survive summary judgment."); *Van Antwerp v. City of Peoria, Ill.*, 627 F.3d 295, 298 (7th Cir. 2010) ("Evidence offered under the direct method must allow a jury to infer more than pretext; it must itself show that the decisionmaker acted because of the prohibited animus." (citation and internal quotation marks omitted)).

demonstrate two of the same elements required by the direct method: first, that [he] engaged in a statutorily protected activity and, second, that [he] suffered an adverse employment action." *Silverman*, 637 F.3d at 742.  In addition, the indirect method requires the plaintiff to show that he met the defendant's legitimate expectations and that he was treated less favorably than similarly situated employees who did not engage in the statutorily protected activity. *Id.*  If he establishes these elements, the burden shifts to the defendant to produce a legitimate, non-retaliatory reason for taking the adverse employment action. *Id.*  If it succeeds in doing so, then the plaintiff must come forward with evidence that the defendant's proffered reasons were only a pretext for retaliating against him. *Id.*

### B.  *Moore's Claim Does Not Survive Under the Direct Method*

Park Center concedes that Moore easily satisfies two of the three elements of his retaliation claim when proceeding under the direct method—that he engaged in statutorily protected activity and suffered an adverse employment action.  It asserts, however, that Moore stumbles when attempting to show that his termination was causally linked to his complaint of sexual harassment.

In attempting to establish a causal nexus between his complaint of harassment and his termination, Moore attempts to create a "convincing mosaic of circumstantial evidence" by asserting the following: (1) he was performing the legitimate expectations of his job before he reported the alleged sexual harassment; (2) he "suddenly became the victim of write-ups and disciplinary actions" after reporting the alleged harassment; (3) the reasons given by Park Center for his discipline and termination—that he had numerous performance deficiencies, performed fraudulent billing, and violated HIPAA—were false; and, finally, (4) the timing between his

report of alleged harassment and his termination, approximately two to three weeks, is "strongly suggestive" of retaliation. (Resp. Br. 9-10.)  Upon examination, however, Moore's so-called mosaic is far from convincing.

To begin, on this record, it is undisputed that Hartley, Moore's supervisor, received two lengthy complaints about Moore's performance before he ever reported the alleged sexual harassment.  Moore first notified Wallace in human resources on February 13, 2009, that he needed to discuss an allegation of sexual harassment with her, and either that same day, or, on February 23, 2009, reported his allegations to Hartley.  By that time, in fact, on February 6, 2009, however, Hartley had already received detailed, written complaints about Moore's performance from both Carlson and Wardell, the psychologists on the treatment team.  Indeed, these concerns did not just suddenly appear on February 6, 2009, because Carlson relayed her concerns about Moore's performance to Wardell on January 23, 2009, *before the alleged sexual harassment ever occurred*.  Thus, Moore's assertion that he was objectively, and satisfactorily, performing the legitimate expectations of the Case Manager II job before he reported the sexual harassment allegations is utterly defied by the record.

Moore's second piece of "evidence"—that he became the victim of disciplinary action only after he reported the sexual harassment—does not particularly further his "convincing mosaic" either.  Of course, as a general principle, "an employee's complaint of harassment does not immunize him from being subsequently disciplined or terminated for inappropriate workplace behavior." *Davis*, 651 F.3d at 675 (quoting *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 359 (7th Cir. 2002)); *Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008) ("[I]nappropriate workplace activities are not legitimized by an earlier-filed complaint of

discrimination.").

Here, Park Center's investigation into Moore's allegations unearthed not only more complaints about Moore's attitude, but also two additional infractions—the purported fraudulent billing and the violation of HIPAA. Therefore, it is undisputed that at least two intervening events came to light separating Moore's complaints from his discharge, and these negate the inference that Moore urges. *Compare Davis*, 651 F.3d at 675 (stating that an inference of causation based on suspicious timing was not warranted where there was a "significant intervening event," plaintiff's violation of its employee guidelines, separating the plaintiff's termination from his complaints of harassment fifteen days earlier); *Argyropoulos*, 539 F.3d at 734 (granting summary judgment on plaintiff's retaliation claim where defendant terminated plaintiff for inappropriate conduct it learned about during the investigation of her sexual harassment complaints), *with Benuzzi*, 647 F.3d at 666 (denying summary judgment where an incredibly short span of time separated plaintiff's filing of an EEOC complaint and her suspension and no intervening events might reasonably have justified the reprimands).

Furthermore, according to one of Moore's two inconsistent versions of the events, Moore first reported his allegations to Hartley at the close of the meeting on February 23, 2009 (rather than on February 13), *after* she had discussed the numerous performance deficiencies with him. Therefore, under that version of Moore's story—which seems to be the version most prevalent in the record—Hartley counseled Moore about his performance before she became aware of his sexual harassment allegations.

Moreover, this is not a case where Moore had a lengthy and spotless work history at Park Center until his complaint of harassment. *See, e.g.*, *Lang v. Ill. Dept. of Children & Family*

*Servs.*, 361 F.3d 416, 420 (7th Cir. 2004) (inferring causation based on suspicious timing where plaintiff had a five-year work history free from criticism, and complaints about his job performance and disciplinary action began in the same month he complained of discrimination). Rather, Moore received a reprimand during the eleven months he worked in Park Center's group home for females, and the complaints about his performance in connection with the adolescent day treatment program began within just weeks of his transfer. Notably, he does not have the years of positive reviews that in some other cases, such as *Lang*, make the discipline appear trumped up, or at least suspicious. *See Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 759 n.17 (7th Cir. 2006) (declining to infer causation based on suspicious timing alone where employee received a negative review after she complained of discrimination but had worked for defendant for less than a year).

Moore's next piece of his "convincing mosaic" of circumstantial evidence is his claim that *all* of the reasons provided by Park Center for terminating him, including, deficient performance, falsifying billing records, and violating Park Center's HIPAA and confidentiality policies, are false. (Resp. Br. 9 ("Mr. Moore denies that *any* of the reasons given by Park Center [for his termination] are true . . . ." (emphasis added).) Yet, as discussed earlier, there is no dispute that by February 6, 2009, before Moore ever engaged in statutorily protected activity, Hartley had already received complaints from both Carlson and Wardell about Moore's performance. Their complaints catalogued a litany of concerns, including Moore's receiving calls, texting, and eating during student group sessions; engaging in inappropriate confrontations and using a "lecture mode" with students; a lack of initiative and professionalism; tardiness; argumentative, defensive, and abrasive behavior; and that, due to the foregoing traits, at least two

students had requested not to work with him. (Hartley Aff. Exs. 1, 2.)

Although Moore denies all of these criticisms, "an employee's own perception of [his] performance is insufficient, and does not constitute affirmative evidence which may defeat a motion for summary judgment." *Bayless v. Ancilla Domini Coll.*, 781 F. Supp. 2d 740, 755 (N.D. Ill. 2011) (citation omitted). The relevant perception is that of Hartley, the decision maker. *Id.* (citation omitted); *see Roberts v. Separators, Inc.*, 172 F.3d 448, 452 (7th Cir. 1999) ("[A]n employee's general averments that he performed adequately are insufficient to create a genuine issue of fact . . . . [He] must produce some independent evidence showing that the company's motives are not believable.").

Furthermore, when Hartley confronted Moore with one of the additional violations that she had learned about through the investigation—that he was entering his clinical documentation before completing his sessions with the students, which she considered to be a fraudulent practice—Moore admitted this infraction. Even crediting Moore's assertion that he was trained by Welling to document in this manner, which the Court must do at this juncture, *Payne*, 337 F.3d at 770, it does not change the fact that Hartley had learned of yet another aspect of Moore's performance, whether a result of an innocent mistake or otherwise, that fell below her expectations. Moreover, when Hartley checked Welling's computer documentation she learned that Welling had never documented in this manner, lending little credence in Hartley's eyes to Moore's proffered excuse for the infraction. *See Hudson v. Wal-Mart Stores, Inc.*, 412 F.3d 781, 786 (7th Cir. 2005) (articulating that defendant's choice to credit the consistent statements of plaintiff's co-workers over plaintiff's own statement in a workplace investigation did not call into question the sincerity of defendant's conclusions).

Similarly, even if Moore had indeed later obtained L.S.'s mother's signed release to talk with the probation department, this is not particularly pivotal, as there is absolutely no evidence that Hartley was either aware of this release, or, as Moore baldly speculates, removed it from L.S.'s file. *See Argyropoulos*, 539 F.3d at 734 (emphasizing that an inference of causation cannot be based on "speculation or conjecture" (citation omitted)). Rather, the record reflects that, at the time, Hartley was faced with a parent who was upset that Moore had spoken with her child's probation officer, and a file reflecting that Park Center was not authorized to speak to the probation department about the child. Given that information, Hartley's conclusion that Moore had violated Park Center's HIPAA policies, even if ultimately incorrect, does not serve to create a "convincing mosaic" of circumstantial evidence of retaliation.

Finally, Moore attempts to establish the causal link requirement by showing that a suspiciously short period of time, approximately two to three weeks, passed between his report of sexual harassment and his termination. "Indeed, adverse actions occasionally 'come so close on the heels of a protected act that an inference of causation is sensible.'" *Benuzzi*, 647 F.3d at 665 (quoting *Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 315 (7th Cir. 2011)); *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 511 (7th Cir. 1998) (stating that as the time period between the protected activity and the adverse employment action increases, the hint of a causal link decreases). The Seventh Circuit Court of Appeals has cautioned, however, that "suspicious timing, standing alone, 'will rarely be sufficient to create a triable issue.'" *Argyropoulos*, 539 F.3d at 734 (quoting *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005)); *see also Burks*, 464 F.3d at 758-59. It has emphasized that "'suspicious timing may be just that—suspicious,' and underscored the importance of context in assessing whether an inference

of causality is warranted or not." *Davis*, 651 F.3d at 675 (quoting *Loudermilk*, 636 F.3d at 315).

The context here does not warrant such an inference. Moore essentially contends that his case is akin to "*Loudermilk*, where the plaintiff was fired immediately after handing his supervisor a written complaint, *see* 636 F.3d at 314, or *Lang*, where the plaintiff's supervisors inexplicably found fault with every aspect of his work performance after he lodged a discrimination complaint, *see* 361 F.3d at 420, or *Humphries* [*v. CBOCS West, Inc.*], 474 F.3d [387], 407 [7th Cir. 2007], . . . where [a] complaining plaintiff[] [was] swiftly discharged without any investigation after allegedly engaging in minor infractions for which no one was generally disciplined." *Davis*, 651 F.3d at 675. However, "[t]hese comparisons are apt only if we close our eyes to the other facts of the case." *Id*.

"In asserting that the proximity of events here similarly implies causation, [Moore] completely ignores the elephant in the room"—the numerous complaints about his performance that preceded his report of sexual harassment and the additional infractions and concerns discovered during the investigation. *Id*. These significant intervening events separated Moore's complaints from his discharge, which was not the case in *Loudermilk, Lang*, or *Humphries*; accordingly, here an inference of causality based on suspicious timing alone is not warranted. *Davis*, 651 F.3d at 675; *see, e.g.*, *Tinnin-Bey v. Marion Cnty. Juvenile Justice Complex*, No. 1:07-cv-1248, 2009 WL 1853205, at *11 (S.D. Ind. June 25, 2009) (denying an inference of causation where an intervening event occurred during the two week interval between plaintiff's report of alleged sexual harassment and his termination).

Furthermore, this is not a case where the challenged supervisor, Hartley, or alleged harasser, Welling, was the only party involved in noting deficiencies in Moore's performance or

in deciding to discharge him.  *Id.*  Here, Carlson and Wardell were the first to lodge complaints about Moore's performance.  Wallace and Stachera jointly performed the investigation and learned additional complaints about Moore's behavior.  Altevogt then reviewed the investigation process and concurred in the conclusion.  Hartley disciplined Moore and, ultimately, recommended his termination.  Her recommendation was then reviewed by Wallace and Altevogt, who concurred in the decision.  Therefore, multiple parties were involved in the sequence of events that culminated in Moore's termination.  Accordingly, the mere fact that Moore's report of alleged sexual harassment closely preceded his discharge is not enough to make this case analogous to those in which no investigation was performed, or where the challenged supervisor or purported harasser was the only actor in the chain of events.[12] *See id.*

To reiterate, under the direct method, "circumstantial evidence must point directly to a discriminatory reason for the employer's action."  *Serednyj*, 656 F.3d at 548 (citation and internal quotation marks omitted).  Here, "[t]ime may be on [Moore's] side, but no reasonable jury could cross the evidentiary chasm separating [his] protected activity from his termination without more than he has presented here."  *Davis*, 651 F.3d at 675.  Therefore, Moore's retaliation claim fails to survive summary judgment under the direct method.

### *C.  Moore's Claim Fails Under the Indirect Method*

Because Moore has failed to substantiate his retaliation claim under the direct method,

---

[12] Moore criticizes Park Center's investigation of his harassment complaints because Wallace and Stachera did not interview him in person.  However, this fact falls short of inferring retaliatory intent on Park Center's part, particularly since Moore concedes that he had already sent Wallace an e-mail on February 23, 2009, detailing his sexual harassment allegations. *See generally Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 677 (7th Cir. 1997) (rejecting shoddy investigation as evidence of discriminatory intent); *Mink v. Barth Elec. Co.*, 685 F. Supp. 2d 914, 931 (S.D. Ind. 2010) (discussing the adequacy of an employer's investigation in response to allegations of sexual harassment); *Walls v. Tempstaff ,Inc.*, No. 5695, 2001 WL 648963, at *5-6 (N.D. Ill. June 5, 2001) (stating that plaintiff's evidence that defendant "did not conduct a sexual harassment investigation like the one detailed in its policy book, without more, is irrelevant for purposes of establishing pretext").

he must rely on the burden-shifting framework of the indirect method. Moore's claim, however, fares no better under this method, as he cannot establish the second and fourth elements of his *prima facie* case or show that Park Center's proffered reason for his termination was pretextual.

In fact, Moore does not even attempt to demonstrate the fourth element of his *prima facie* case, that is, to identify a similarly situated individual who did not engage in the statutorily protected activity and was treated more favorably. *See Silverman*, 637 F.3d at 742. As a result, his *prima facie* case quickly collapses.

As to the second element, the Court is faced with the classic situation wherein an employer's alleged non-discriminatory reason for terminating the plaintiff is that the employee's performance did not meet the employer's expectations. In cases where this occurs, the legitimate expectations prong of the prima facie case often merges with the related issue of pretext. *See Roberts*, 172 F.3d at 451 (instructing that the analysis of an employer's legitimate expectations often "dovetails" with that of pretext).

On this record, no reasonable jury could infer that Park Center's proffered reason for terminating Moore—his numerous performance problems—was pretextual. "Pretext is more than just faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action." *Silverman*, 637 F.3d at 743-44 (citation and internal quotation marks omitted); *see also Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 419 (7th Cir. 2006) (articulating that pretext is a "deliberate falsehood"). Here, in an effort to establish pretext, Moore baldly asserts that he was a "good employee" and that all of Park Center's criticisms of his performance are false. (Resp. Br. 9.)

Of course, as explained earlier, Moore's self evaluation of his own performance is

irrelevant, as "[t]he perception of the decisionmaker is controlling." *Stockwell v. City of Harvey*, 597 F.3d 895, 903 (7th Cir. 2010). To reiterate, Hartley had received two lengthy complaints about Moore's performance before he ever reported the sexual harassment allegations to her or Wallace, and additional performance infractions came to light during the investigation of the allegations. Moore even admitted in his deposition that he committed one of the violations—performing his documentation before completing client sessions—and thus there is no dispute that this performance deficiency occurred.

And as explained earlier, even if Hartley was mistaken about Moore's purported violation of Park Center's HIPAA and confidentiality policies, this is of no moment, as "[e]ven if the reasons for [the plaintiff's termination] were mistaken, ill considered or foolish, so long as [the defendant] honestly believed those reasons, pretext has not been shown." *Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000); *see Roberts*, 172 F.3d at 453 (emphasizing that it is not enough that the plaintiff simply prove that he did not commit the performance infractions for which he was terminated—"he must prove that the defendant did not honestly believe he had made them"). Here, even if Moore had been able to establish his *prima face* case, there is simply no evidence upon which to infer that Park Center's proffered reason for his termination was "phony" or a lie, ringing the death knell for his claim under the indirect method. *Silverman*, 637 F.3d at 743.

Because Moore has failed to establish his claim of retaliation under either the direct or indirect method of proof, Park Center's motion for summary judgment will be granted.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment on all claims

(Docket # 19) is GRANTED.  The Clerk is DIRECTED to enter a judgment in favor of

Defendant and against Plaintiff.

      SO ORDERED.

      Enter for November 23, 2011.

                            S/ Roger B. Cosbey
                            Roger B. Cosbey
                            United States Magistrate Judge